# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **TIFFANY FABIYI,** | ) | |
| | ) | **No. 11 CV 8085** |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Magistrate Judge Young B. Kim** |
| | ) | |
| **MCDONALD'S CORPORATION,** | ) | |
| | ) | **March 13, 2014** |
| **Defendant.** | ) | |

## MEMORANDUM OPINION and ORDER

Tiffany Fabiyi sued her former employer, the McDonald's Corporation ("the company"), alleging that the company unlawfully discriminated against her on the basis of race, sex, marital status, and disability. She alleges violations of 42 U.S.C. § 1981 ("Section 1981"), Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, and the Illinois Human Rights Act ("IHRA"), 775 ILCS 5/1-101, *et seq*. The company now moves for summary judgment pursuant to Federal Rule of Civil Procedure 56. The motion is granted for the following reasons:

## Background

### A. Local Rule 56.1

Local Rule ("L.R.") 56.1(a)(3) requires the party moving for summary judgment to provide "a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law." L.R. 56.1(a)(3). L.R. 56.1(b) requires the opposing party to file

a response including "a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon," and "a statement . . . of any additional facts that require the denial of summary judgment, including references to the affidavits, parts of the record, and other supporting materials relied upon." L.R. 56.1(b)(3)(B),(C).

Local Rule 56.1 "is designed, in part, to aid the district court, which does not have the advantage of the parties' familiarity with the record and often cannot afford to spend the time combing the record to locate the relevant information, in determining whether a trial is necessary." *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011) (internal quotation omitted). It serves to organize the evidence, identify undisputed facts, and demonstrate "precisely how each side propose[s] to prove a disputed fact with admissible evidence." *Bordelon v. Chicago Sch. Reform Bd. of Trs.,* 233 F.3d 524, 527 (7th Cir. 2000). Though this court must "liberally construe the pleadings of individuals who proceed *pro se*," it is not "obliged . . . to scour the record looking for factual disputes." *Greer v. Bd. of Educ. of City of Chicago*, 267 F.3d 723, 727 (7th Cir. 2001) (internal quotations and citations omitted).

Shortly after filing its L.R. 56.1(a)(3) Statement of Material Facts,[1] the company filed a notice to "Pro Se Litigant Opposing a Motion for Summary

---

[1] The company's L.R. 56.1(a)(3) Statement of Material Facts is cited as "Def.'s Facts ¶ __."

Judgment" to explain to Fabiyi the requirements of L.R. 56.1. (R. 43, 57.) The Notice informed Fabiyi that if she wished to dispute any of the facts submitted by the company or to submit her own facts, she must refer to documents and declarations to substantiate her factual allegations. (R. 57.) The Notice also cautioned Fabiyi that this court would deem the company's facts to be admitted if she failed to controvert them in the method delineated by the local rules. Id.; *see also Keeton v. Morningstar*, 667 F.3d 877, 880 (7th Cir. 2012) ("[W]hen a party fails to comply with the local rule requiring a response to a statement of undisputed material facts, the court may rely on the opposing party's statement to the extent that it is supported by citations to relevant evidence in the record.").

Fabiyi appears to have attempted to heed the company's warnings—she submitted a L.R. 56.1(b)(3)(B) response and L.R. 56.1(b)(3)(C) statement of additional facts.[2] (See R. 70.) Unfortunately for Fabiyi, nearly all of her attempts to rebut the company's factual assertions consist of baseless, unsubstantiated denials that are woefully deficient. (R. 70, Pl.'s Fact Resp. ¶¶ 4-24, 26-31, 33, 36, 45-47, 52-53, 55-60, 62, 67, 68, 70-71, 79, 80.) "[M]ere disagreement with the movant's asserted facts is inadequate if made without reference to specific supporting material." *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003). She rejects some facts due to "insufficient knowledge" without challenging the authenticity or relevancy of the company's supporting evidence. (R. 70, Pl.'s Fact Resp. ¶¶ 32, 53.)

---

[2] Fabiyi's L.R. 56.1(b)(3)(B) Response to Defendant's Statement of Material Facts is cited as "Pl.'s Fact Resp. ¶ __." Her L.R. 56.1(b)(3)(C) Statement of Additional Facts is cited as "Pl.'s Facts ¶ __."

Other denials are unclear, (id. ¶¶ 33, 37, 39, 40-42, 48-50, 61, 64, 72-76), or they merely claim that evidence would support her claim had it been gathered, (id. ¶¶ 43-44, 63, 65, 66, 78). These responses do not comply with L.R. 56.1's requirement that disagreements be supported by "references to the affidavits, parts of the record, and other supporting materials relied upon." *See* L.R. 56.1(b)(3)(B); *see also Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006) (upholding district court's rejection of a L.R. 56.1 statement of facts because "it failed to adequately cite the record and was filled with irrelevant information, legal arguments, and conjecture").

Fabiyi's Statement of Additional Facts is similarly rife with violations of Local Rule 56.1(b)(3)(C). This court disregards the assertions that are legal in nature. (See R. 70, Pl.'s Facts ¶ 32.) Additionally, this court disregards the assertions that are vague and unclear, (see Id. ¶¶ 10, 15, 19, 39); submitted with no supporting evidence whatsoever, (see id. ¶¶ 22, 25); submitted with evidence, or citing to the company's evidence, that contradicts the assertion Fabiyi sought to support, (see id. ¶¶ 2, 4, 5, 13, 14); supported only by citations to allegations that Fabiyi made to the company's investigators, her complaint, her notes, or during her deposition, (see id. ¶¶ 6, 18, 34); and submitted with evidence that lacks foundation, or is irrelevant or incomplete, (see id. ¶¶ 3, 7-9, 11, 12, 15-17, 20, 21, 23, 24, 26, 27, 29-38, 40). *See Cichon v. Exelon Generation Co., L.L.C.,* 401 F.3d 803, 809-10 (7th Cir. 2005) ("A district court does not abuse its discretion when, in imposing a

penalty for a litigant's non-compliance with Local Rule 56.1, the court chooses to ignore and not consider the additional facts that a litigant has proposed.").

Similarly, to the extent that the company advanced factual or legal arguments in its statement of facts, or failed to provide sufficient evidence to establish its proposed statements of fact, this court disregarded them. (*See* R. 43, Def.'s Facts ¶¶ 34, 43, 56, 63, 64, 72, 77.) Even as this court adopts the majority of the company's statement of facts, it views those facts in the light most favorable to Fabiyi. *See Adams v. Wal-Mart Stores, Inc.,* 324 F.3d 935, 937 (7th Cir. 2003).

## B. Facts

Fabiyi is an African American woman. (R. 43, Def.'s Facts ¶ 1.) She began working for the company in March 1999 at one of its restaurants located in Oak Brook, Illinois. (Id. ¶ 2; see also R. 74, Fabiyi Dep. at 63.) She transferred to the Naper Boulevard restaurant in September 2008 from the company's Spring Road Restaurant. (R.43, Def.'s Facts ¶ 4; see also id., Ex. B ¶ 3.) Debbie Piasecki, the general manager of the Naper Boulevard restaurant, approved Fabiyi's transfer. (R. 43, Def.'s Facts ¶ 4.) Fabiyi's job title was "Crew." (Id. ¶ 3; see also R. 74, Fabiyi Dep. at 78.) Crew members are trained on multiple work stations and are responsible for making fries, keeping the work area clean, collecting dirty trays from the lobby, conducting sweeps and mops, and working the cash register. (R. 43, Def.'s Facts ¶ 5.) The company does not have a seniority system and Crew members are assigned to work different stations as needed. (Id. ¶ 9.)

Crew trainers teach, coach, and train Crew employees. (Id. ¶ 13.) Crew members are eligible for a promotion to the Crew trainer position if they meet the minimum qualifications for promotion specified in the company's "Readiness for Advancement Checklist." (Id. ¶ 14.) Two of the mandatory qualifications for advancement are being available to work as needed, including on weekends and evenings, and meeting performance standards. (Id.) In 2008, likely while Fabiyi was employed at the Spring Road restaurant, supervisor Ruth Smith gave Crew trainer books to Fabiyi and many other Crew members. (Id. ¶ 15; see also R. 70, Pl.'s Facts ¶ 3; R. 74, Fabiyi Dep. at 140-41.) Smith provided the Crew trainer books to her employees regardless of whether they met the requirements for promotion. (R. 43, Def.'s Facts ¶ 15; see also R. 70, Pl.'s Facts ¶ 3.) Smith trained male, female, African American and non-African American Crew members for the Crew trainer position, but not Fabiyi. (R. 43, Def.'s Facts at ¶¶ 16-17.) Fabiyi lodged a complaint with the company about her denial of training.[3] (Id. ¶ 20.) Piasecki believed that Fabiyi was ineligible for the training because she was not available to work weekends and evenings. (Id. ¶ 17.) Smith believed that Fabiyi was ineligible for the training because of her lack of availability and her work performance. (R. 43, Def.'s Facts, Ex. D ¶ 10.) Fabiyi does not dispute that she was unavailable to work weekends and evenings. (See R. 70, Pl.'s Fact Resp. ¶ 17.)

---

[3] Neither party submitted evidence of how or when Fabiyi registered this complaint but the company investigated this in October 2009. (R. 43, Def.'s Facts ¶ 20.)

On March 18, 2009, Fabiyi registered a complaint with the company's business integrity phone line. (R. 70, Pl.'s Facts, Ex. N.) She claimed that a manager had corrected her in front of customers, and she also renewed her complaint that she had been unfairly denied a promotion to the Crew trainer position. (Id.) A week later, on March 25, Fabiyi received an overall performance rating of "Good" on her "Team Member Performance Update." (See R. 43, Def.'s Facts, Ex. C, Group Ex. A.) But Fabiyi's relationship with management soured as evidenced by the 11 write-ups in Fabiyi's file and her at least 5 additional calls to the company's business integrity phone line complaining of perceived discrimination and retaliation during the following two years. (R. 43, Def.'s Facts ¶¶ 18, 20, 25, 30, 33, 37, 40, 44; R. 70, see also Ex. B ¶¶ 15-18, Group Ex. B; see also R. 70, Pl.'s Facts, Exs. B, N.) Between March and November 2009 alone, Fabiyi accumulated five write-ups for the following violations: being insubordinate, leaving the job during her shift, refusing to work the fry station, failing to report for work without timely notice, and shorting her cash register. (R. 43, Def.'s Facts ¶ 18, & Ex. B, Group Ex. B.) Fabiyi does not deny that she received write-ups, nor does she specifically deny engaging in the actions that are documented in the write-ups. (R. 70, Pl.'s Fact Resp. ¶ 18.) But she claims that these write-ups, like the many others that followed, were the products of discrimination or retaliation for her complaints. (Id.)

In October 2009, Sarah Dudan, a Human Resources Manager ("HR Manager") with the company, investigated Fabiyi's complaint that she had been wrongfully denied training because of discrimination or retaliation in October 2009.

(R. 43, Def.'s Facts ¶ 20.)  Dudan found that Fabiyi was not eligible for the training because of her poor work performance.  (Id.)  Fabiyi called the business integrity phone line again on January 26, 2010, to complain that Piasecki had yelled at her when she asked for her performance review.  (R. 43, Def.'s Facts ¶ 25.)  At her deposition, Fabiyi explained that Piasecki yelled, "I'm going to give it to you," after Fabiyi demanded her performance review.  (R. 74, Fabiyi Dep. at 122.)  Fabiyi characterized this yelling as "humiliating" because it was in front of customers. (Id.)  After the alleged yelling, Piasecki provided the evaluation which noted that Fabiyi met the company's standards in five performance areas, but failed to meet the standards in thirteen areas, earning her an overall rating of "Needs Improvement."  (R. 43, Def.'s Facts ¶ 21, Ex. C ¶ 8, Group Ex. B.)  Pursuant to the company's wage guidelines, which provide that employees with "Needs Improvement" ratings are not entitled to wage increases, Fabiyi did not receive a merit wage increase.  (R. 43, Def.'s Facts ¶¶ 22-23.)  She testified that "everyone pretty much got their raise except me," including male and female African Americans.  (Id. ¶ 24.)

Fabiyi called the business integrity phone line again the next day, January 27, 2010, to claim that she was denied a fair wage because of her sex and denied a promotion because of her race.  (R. 70, Pl.'s Facts, Ex N.)  Two days later, restaurant managers Antonio Gass and Piasecki reprimanded Fabiyi for a register shortage and warned her that the next shortage would result in a suspension. (R. 43, Def.'s Facts ¶ 18, Ex. B ¶ 5, Group Ex. B.)  Fabiyi does not deny that she was

reprimanded or that she had a register shortage, but views the reprimand as a form of retaliation for her complaints of discrimination. (R. 70, Pl.'s Fact Resp. ¶ 18.) In February 2010 Dudan investigated Fabiyi's claims that Piasecki had yelled at her and denied her a fair wage. (Id. ¶ 26.) Dudan declares that she found no evidence of discrimination, harassment, or retaliation, and that she communicated these findings to Fabiyi. (Id. ¶ 29.) Fabiyi denies that the investigation occurred but does not deny Dudan's statement that she communicated her conclusion to Fabiyi. (R. 70, Pl.'s Fact Resp. ¶ 29.)

Fabiyi failed to show up for work on April 29, 2010. (R. 43, Def.'s Facts ¶ 30.) The company claims that she did not call in absent, but Fabiyi claims that she gave two-hour notice before missing her shift. (Contrast id. and R. 70, Pl.'s Fact Resp. ¶ 30.) Piasecki issued Fabiyi a one-week suspension on May 3, 2010, for her unexcused absences on October 26, 2009, April 19, 2010,[4] and April 29, 2010. (See id. ¶¶ 30-31.) Fabiyi called the business integrity line on May 6, 2010, and complained that the suspension was motivated by discrimination. (Id. ¶ 33.) She also filed a complaint with the Illinois Department of Human Rights ("IDHR") on that date to allege race and sex discrimination and retaliation. (R. 70, Pl.'s Facts, Ex. K.)

---

[4] The record does not include evidence of an absence on April 19, 2010. (See R. 43, Def.'s Facts, Ex. B, Group Ex. B.) However, the record contains a reprimand for an unexcused absence on October 26, 2009. (Id. at 19.) That reprimand warned Fabiyi that the next unexcused absence would result in suspension. (Id.)

On May 26, 2010, Fabiyi had another difficult day at the Naper Boulevard restaurant. (R. 43, Def.'s Facts ¶¶ 34-37.) She called the business integrity line to complain that Julio Alvarez, the swing manager, walked up behind her and rubbed her behind. (Id. ¶ 37; R. 70, Pl.'s Facts, Ex. B.[5]) When she complained about the inappropriate touching, she asked that Kimberly Smith, a member of the company's HR department, investigate the matter. (R. 70, Pl.'s Facts, Ex. B.) Fabiyi testified that she "brought it to [Alvarez's] attention that he had just rubbed my butt." (R. 74, Fabiyi Dep. at 160.) As a swing manager Alvarez did not have the authority to fire Fabiyi. (R. 43, Def.'s Facts ¶ 36.) Sometime that day after the alleged touching by Alvarez, Fabiyi and another female employee argued at the front counter and did not stop arguing despite a warning from Piasecki. (Id. ¶ 35.) Piasecki and Gass reprimanded Fabiyi and sent her home. (Id.) Fabiyi complained that this discipline was because of her complaint to the business integrity phone line about the alleged touching by Alvarez. (R. 70, Pl.'s Fact Resp. ¶ 35.)

In June 2010, Kimberly Smith investigated Fabiyi's complaints of the alleged inappropriate touching, the May 2010 suspension, and her previous complaints about the denial of training for the Crew trainer position and denial of a raise. (R. 43, Def.'s Facts ¶¶ 27, 33, 37.) Fabiyi suggests that this investigation was incomplete because Kimberly Smith did not question supervisor Ruth Smith regarding her knowledge or participation in the alleged discrimination and/or

---

[5] This court did not take into account the unauthenticated handwriting on this document.

retaliation. (R. 70, Pl.'s Facts ¶ 27.) Kimberly Smith concluded that none of the company's policies had been violated and communicated her findings to Fabiyi. (R. 43, Def.'s Facts ¶¶ 27, 33, 37.) Fabiyi denies hearing about the investigation. (R. 70, Pl.'s Fact Resp. ¶¶ 33, 37.)

Fabiyi received another performance evaluation on July 1, 2010, and again her performance was rated as "Needs Improvement." (R. 43, Def.'s Facts ¶ 47.) Later that month, when manager Gass asked Fabiyi to clean the lot and lobby, she refused, arguing that the job was not appropriate for her because of her seniority. (Id. ¶ 40.) At her deposition, Fabiyi reiterated this belief. (R. 74, Fabiyi Dep. at 173.) But she also testified that cleaning the lot and lobby is a Crew member's duty, and that both "black and nonblack" Crew members were asked to clean the lot and lobby. (Id. at 174, 178.) Fabiyi admits that she refused to clean the lot and lobby in July 2010 but claims that "SENIORITY was a motived [sic] my discrimination." (R. 70, Pl.'s Fact Resp. ¶ 40.) The court takes this to mean that Fabiyi alleges that the company does not have a seniority system because of a discriminatory motive, though she did not submit any evidence to support this theory. (See also R. 70, Pl.'s Facts ¶ 18.) She also suggests that Gass disciplined her to retaliate against her for her complaints to the business integrity line. (R. 70, Pl.'s Fact Resp. ¶ 43.) However, at her deposition, she admitted that she was not sure whether Gass was even aware of her complaints to the IDHR or the business integrity line. (R. 74, Fabiyi Dep. at 176; R. 75, Fabiyi Dep. at 200-01, 223-25.)

On October 6, 2010, Fabiyi again refused to clean the lot and lobby. (R. 43, Def.'s Facts ¶ 44.) Gass asked Fabiyi if a medical condition prohibited her from performing the task and Fabiyi said no. (Id.) Fabiyi told Gass that this task was for the maintenance man. (Id., Ex. B, Group Ex. B.) On the employee action form that documented the incident, Fabiyi wrote that "this is harassment coming from Manage[ment]." (Id.) Fabiyi admits that she refused to clean the lot and lobby but reasserts that "SENIORITY was a motived [sic] my discrimination." (R. 70, Pl.'s Fact Resp. ¶ 44.) A few months later, on December 30, 2010, Fabiyi called the business integrity line to renew her complaint about Alvarez touching her and to complain of general discrimination. (R. 43, Def.'s Facts, Ex. B ¶ 17.)

The Naper Boulevard restaurant used a computer system to assign hours to Crew members. (Id. ¶ 10.) The system considered employee availability and anticipated sales. (Id.) A poster in the Crew room in the Naper Boulevard restaurant communicated the company's policy of adjusting employee hours based on weather and performance, such that better weather and better performance would result in more work hours. (Id. ¶ 46.) Fabiyi denies that the poster indicated that performance was a factor. (R. 70, Pl.'s Fact Resp. ¶ 46.) In January 2011 Fabiyi's scheduled hours were reduced. (Id. ¶ 48.) When Fabiyi asked Gass why her hours were cut back, he told her that it was because she failed to meet performance expectations. (Id.) Fabiyi testified that she was not aware of any non-African American Crew members with "Needs Improvement" ratings with more scheduled hours than her. (R. 74, Fabiyi Dep. at 200.)

Kimberly Smith conducted another investigation into Fabiyi's claims of discrimination in February 2011. (R. 43, Def.'s Facts ¶ 45.) Smith was of the opinion that no discrimination or retaliation against Fabiyi had occurred, and she communicated her finding to Fabiyi. (Id.) Fabiyi denies that this investigation occurred but provided no evidence to the contrary. (R. 70, Pl.'s Fact Resp. ¶ 45.)

Fabiyi testified to a second touching by Alvarez sometime before April 30, 2011, though she did not confront him about the touching nor did she report it to the company at that time. (R. 43, Def.'s Facts ¶¶ 38-39.) She claimed that he touched her behind with his groin area. (Id.) She testified that she did not report this second incident because she believed that the company would not take any action. (R. 74, Fabiyi Dep. at 165-66.) On April 26, 2011, she complained to the IDHR that Alvarez engaged in at least two incidents of sexual misconduct involving his touching of her behind with his hands or body between May 2010 and April 25, 2011. (R. 70, Pl.'s Facts, Ex. O.)

On April 28, 2011, Fabiyi received her bi-annual performance evaluation. (R. 43, Def.'s Facts ¶ 52.) Again, her "Team Member Performance Update" showed a rating of "Needs Improvement." (Id.) Pursuant to the company's wage guidelines, which rendered employees with "Needs Improvement" ratings ineligible for wage increases, Fabiyi did not qualify for a raise. (Id. ¶¶ 56-57.) Fabiyi testified that some "nonblacks" who worked at the grill station received raises. (R. 75, Fabiyi Dep. at 209-10.) According to Fabiyi's own testimony, those employees were lauded by Piasecki for doing a great job. (Id.) The following month, in May 2011, Fabiyi's

hours were reduced because of her poor performance. (R. 43, Def.'s Facts ¶ 59.) Fabiyi admitted that some African American women were scheduled to work more hours than her. (R. 75, Fabiyi Dep. at 213.)

Gass filed an employee action form on June 2, 2011, to document another incident of Fabiyi's refusal to follow instructions. (R. 43, Def.'s Facts ¶ 62.) According to this form, Gass asked Fabiyi to clean, sweep, and mop the lot and lobby. (Id.) Fabiyi told Gass that she would not sweep or mop because the new hires could do the job. (Id., Ex. B ¶¶ 5, 18 & Group Ex. B at 28.) He asked whether she had a medical condition that prohibited her from doing the work, and to provide documentation if that was the case. (Id., Ex. B ¶ 5 & Group Ex. B at 28.) In her deposition, Fabiyi said that during this exchange, Gass screamed and yelled from across the room that "I asked you to do it," meaning to clean the lot and lobby. (R. 75, Fabiyi Dep. at 215-16.) Fabiyi called the business integrity phone line that day to complain that Gass had sent her home because of her refusal to clean the lobby. (R. 43, Def.'s Facts, Ex. B ¶ 18; see also R. 70, Pl.'s Facts, Ex. B.) During the call Fabiyi said that she told Gass that she would not sweep or clean the lobby because of her back pain. (R. 70, Pl.'s Facts, Ex. B.) Fabiyi testified that she believed that Gass's actions were motivated by a desire to retaliate against her for her complaints to the IDHR. (R. 75, Fabiyi Dep. at 223-24.)

The next day, Marcus Garrison, an operations consultant for the company, met with Fabiyi to discuss the prior day's incident. (R. 43, Def.'s Facts ¶ 65; R. 75, Fabiyi Dep. at 221.) According to Fabiyi's testimony, she recalls telling Garrison

that she could not sweep or mop because her back was out, and Garrison asking her for a doctor's statement to confirm her condition. (R. 75, Fabiyi Dep. at 227, 256.) She alleges that Garrison spoke in a loud tone, and "went into screaming and yelling at me about . . . I was in the wrong and he was right." (Id. at 222.) She claims that Garrison said that "if I didn't do this work, he was going to make sure that I would be dealt with." (Id. at 222-23.) She now denies that any medical condition prevented her from cleaning the lot and lobby. (R. 70, Pl.'s Fact Resp. ¶ 64 ("Plaintiff, Tiffany Fabiyi denies, said no medical condition prevented her from cleaning the lot and lobby.").)

About two weeks later, Fabiyi provided the company with a note from Dr. Robert King, dated June 15, 2011, which said that Fabiyi should avoid bending over the fry station for more than 30 minutes and should not bend over with a heavy mop. (R. 43, Def.'s Facts ¶ 68.) On July 8, 2011, HR Manager Dudan met with Fabiyi to discuss her medical limitations. (Id. ¶ 70.) Dudan requested a doctor's note specifying Fabiyi's weight restrictions and the duration of those restrictions. (Id.) The next day, the company placed Fabiyi on an unpaid medical leave. (Id. ¶ 74.) Fabiyi sought the documentation Dudan requested from Dr. Seth Osafo. (Id. ¶ 71.) He wrote a note dated July 12, 2011, stating that because of Fabiyi's chronic back pain, she was unable to engage in excessive bending or heavy lifting. (Id.)

That same month, in July 2011, Kimberly Smith investigated Fabiyi's complaints of yelling, disability discrimination, and her removal from the work

schedule. (Id. ¶¶ 55, 58, 66.) Smith concluded that there was no evidence of discrimination or retaliation. (Id. ¶¶ 55, 58, 66.) Fabiyi does not deny that Smith performed the investigation, but she disagrees with Smith's conclusion. (R. 70, Pl.'s Fact Resp. ¶¶ 55, 58.) Dr. Osafo provided an updated note on August 20, 2011, restricting Fabiyi to bending only as tolerated and from lifting over 10 pounds for an additional three-month period. (R. 43, Def.'s Facts ¶ 75.) Two years later, at his deposition, Dr. Osafo testified that he had no clinical basis to believe that Fabiyi needed these restrictions. (Id. ¶ 73.) At his deposition, the company's counsel asked, "there's no question you gave restrictions that you don't believe are clinically valid," and Dr. Osafo replied, "that's correct." (Id., Ex. F, Dr. Osafo Dep. at 134:5-8.)

On September 14, 2011, Fabiyi met with Ivy Robles, a Human Resources Partner at the company, to discuss her medical restrictions. (Id. ¶ 77.) Fabiyi's and Robles's accounts of the conversation are somewhat at odds. (Compare id. with R. 70, Pl.'s Resp. ¶ 77.) Fabiyi provided a letter from Dr. Osafo to the company in January 2012 that renewed her restrictions as of November 29, 2011, and followed with a similar March 2012 letter. (See R. 43, Def.'s Facts ¶¶ 78-79; see also R. 43, Ex. B ¶ 25 & Group Ex. J.)[6] When the restrictions in Dr. Osafo's notes expired in November 2011, December 2011, and March 2012, the company contacted Fabiyi to

---

[6] Neither the November 2011 nor the March 2012 letter is in the record. However, because they are referenced in letters from the company to Fabiyi that are in the record, and because Fabiyi did not deny the company's assertions about the letters, (see R. 70, Pl.'s Fact Resp. ¶¶ 78-79), this court accepts the company's assertions about the letters, (see L.R. 56.1(b)(3)(B) ("All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party.")).

request updated information about her condition.  (R. 43, Def.'s Facts ¶ 78.)  Neither Fabiyi nor Dr. Osafo provided any further updates on her condition.  (Id. ¶ 79.)

## Analysis

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The company bears the initial burden of demonstrating that there is no genuine dispute of material fact and that it is entitled to judgment as a matter of law.  *See Kramer v. Vill. of N. Fond du Lac,* 384 F.3d 856, 861 (7th Cir. 2004.)  If the company meets this burden, Fabiyi "may not simply rest upon the pleadings but must instead submit evidentiary materials that 'set forth specific facts showing there is a genuine issue for trial.'"  *See Jones v. City of Elkhart, Ind.*, 737 F.3d 1107, 1112-1113 (7th Cir. 2013) (quoting Fed. R. Civ. P. 56(e)).  This court construes the evidence in the light most favorable to Fabiyi, the non-moving party.  *Keeton*, 667 F.3d at 884.

In this case, the parties present contradictory accounts of the company's motivations for denying Fabiyi promotions, raises, and work hours, and for its decision to remove her from the work schedule.  Summary judgment is not "a vehicle for resolving factual disputes."  *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994.)  This court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for the factfinder."  *Payne v. Pauley,*  337 F.3d 767, 770 (7th Cir. 2003) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986)).  Rather, this court must

examine the admissible evidence to decide whether there is any material dispute of fact that requires a trial. *Kodish v. Oakbrook Terrace Fire Prot. Dist.*, 604 F.3d 490, 507 (7th Cir. 2010).

Fabiyi alleges race and sex discrimination, retaliation, and harassment in violation of Title VII. She also alleges race discrimination under Section 1981, disability discrimination under the ADA, and marital status discrimination under IHRA.[7] (R. 11, Am. Compl.) The substantive standards governing Title VII apply to Fabiyi's claim under 42 U.S.C. § 1981. *See Humphries v. CBOCS West, Inc.,* 474 F.3d 387, 403-04 (7th Cir. 2007). Fabiyi's marital status claim under IHRA is also evaluated under the same standards. *See Zaderaka v. Illinois Human Rights Comm'n*, 545 N.E.2d 684, 687 (Ill. 1989).

## A.    Disparate Treatment Claims

Because Fabiyi has not presented any direct evidence of discrimination to support her race, sex, marital status, or disability discrimination claims, this court employs the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). "Under the burden-shifting analysis, a plaintiff must first establish a *prima facie* case of discrimination by demonstrating that (1) she is a member of a protected class; (2) she met her employer's legitimate job expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees

---

[7] In her summary judgment brief, Fabiyi refers to the Family Medical Leave Act, 29 U.S.C. § 2601, *et seq.*, and the Employee Retirement Income Security Act, 29 U.S.C. § 1001, *et seq.,* and suggests that she is advancing claims arising under those statutes. She did not raise these claims in her complaint and they are not properly before this court. (See R. 11, Am. Compl.)

outside of the protected class received more favorable treatment." *Keeton*, 667 F.3d at 884. Fabiyi bears the burden of establishing her claim under Title VII. *See Goodman v. Nat'l Sec. Agency, Inc.,* 621 F.3d 651, 656 (7th Cir. 2010). If she establishes her claim, then the burden shifts to the employer to offer a legitimate, nondiscriminatory reason for the adverse employment action. If the employer does so, the burden shifts back to the plaintiff to submit evidence demonstrating that the employer's explanation is pretextual. *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008).

The parties agree that Fabiyi is a member of a protected class. The company also implicitly concedes that the following events constitute adverse employment actions: denials of salary increases to Fabiyi in January 2010 and April 2011; her one-week suspension in May 2010; reduction of Fabiyi's scheduled hours in January and May 2011; and removal of Fabiyi from the work schedule. The company challenges Fabiyi's claims that the following events also constitute adverse employment actions: refusal to train Fabiyi for the Crew trainer position; Piasecki's alleged yelling episode in January 2010; and Gass's and Garrison's alleged yelling episodes in June 2010.

This court agrees with the company that the three alleged incidents of yelling, taken individually and together, do not rise to the level of actionable adverse employment actions. An adverse employment action is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a

significant change in benefits." *Burlington Ind., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). "[N]ot everything that makes an employee unhappy is an actionable adverse action." *Bell v. E.P.A.*, 232 F.3d 546, 555 (7th Cir. 2000). "General hostility and comments do not qualify as actionable adverse employment actions unless the hostility was severe and pervasive." *Griffin v. Potter*, 356 F.3d 824, 829 (7th Cir. 2004). Fabiyi described three instances of yelling: (1) Piasecki yelled about providing Fabiyi's performance evaluation, which allegedly humiliated Fabiyi because customers were present; (2) Gass yelled at Fabiyi from across the room to clean the lot and lobby, and (3) Garrison yelled at Fabiyi about her refusal to clean the lot and lobby. These three instances of yelling are neither sufficiently severe nor pervasive to be actionable. *See Griffin,* 356 F. 3d at 829 (supervisor's criticism of an employee at staff meetings over a two-month period was not actionable); *Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1107-08 (7th Cir. 2012) (isolated instances of being called names by a supervisor are not materially adverse employment actions).

Regarding the 2008 denial of training for the Crew trainer position, however, this court agrees with Fabiyi that the company's refusal to train her for the Crew trainer role was an actionable adverse action. *See Durkin v. City of Chicago,* 341 F.3d 606, 611 (7th Cir. 2003) ("A discriminatory denial of job-related training can constitute an adverse employment action under Title VII."); *see also Pafford v. Herman,* 148 F.3d 658, 667 (7th Cir. 1998) (stating the elements of a prima facie case of discriminatory failure to train).

## 1.    Failure to Train

"[T]o make out a prima facie case of discriminatory failure to train [the plaintiff] must demonstrate: (1) that she is a member of a protected group; (2) that the [company] provided training to its employees; (3) that she was eligible for training; and (4) that she was not provided training under circumstances giving rise to an inference of discrimination, *i.e.*, that she was denied training given to other similarly situated employees who were not members of the protected group." *Pafford,* 148 F.3d at 667.  At issue here are the last two elements.  Regarding eligibility for training, the company argues that Fabiyi did not meet the first of its minimum qualifications for the Crew trainer position: that she be available to work weekends and evenings.  Fabiyi concedes this point—her brief and L.R. 56.1 filings do not question the existence of this availability requirement or her inability to meet that requirement.  Instead of acknowledging the restrictions on her availability, Fabiyi suggests that the company required Crew trainers to be available to work weekends and evenings "because defendant did not want blacks." (R. 70, Pl.'s Fact Resp. ¶ 14.)  Fabiyi offers no evidence to substantiate this theory, and so this court cannot consider such conjecture.  *See Kodish*, 604 F.3d at 508 ("[A] plaintiff cannot thwart summary judgment by asking a court to make inferences based on . . . speculations as to the defendant's state of mind.").

The company also argues that Fabiyi was ineligible for the training because her performance appraisal ratings were too low. Fabiyi contests the company's characterization of her performance reviews from 2008.  To show her strong

performance record, she submitted reviews from an employer called "SEI LLC." (R. 70, Pl.'s Facts, Ex. L.)  The court disregards these reviews because they are not authenticated nor relevant to the question of Fabiyi's performance as a Crew member for the company.  She also submitted the following performance appraisals from the company: a 1999 "Team Member Performance Update" rating her performance as "[g]ood"; April and July 2007 "Team Member Performance Updates" again rating her performance as "[g]ood"; an April 2008 "Employee Action Form" commending her "hard work and dedication"; and a July 2008 "Team Member Performance Update" rating her performance as "[g]ood."  (R. 70, Pl.'s Facts, Ex. L.)

The court disregards the 1999 performance review because there is no evidence from which the court can infer that the supervisors who made the training decision were aware of this review, which took place many years prior to the decision in question.  Regarding the performance reviews and employee action forms from 2007 and 2008, the company argues that they are inadmissible hearsay—though it urges this court to consider the many other performance reviews and employee action forms that it submitted to support its defense.  (See R. 43, Ex. B, Group Ex. B & Ex. C, Group Ex. A.)  The forms likely meet the business record exception to the hearsay rule under Federal Rule of Evidence 803(6)(B) because they were generated in the company's regularly conducted human resources activities.  But putting aside concerns about the admissibility of the 2007 and 2008 documents for the moment, they are relevant only if the company denied Fabiyi the training in 2008, when she appears to have been in good standing.  If the

company denied the training opportunity at some time later in 2009, after Fabiyi had been written up for numerous violations of company policies, then the earlier reviews are of less importance. *See Fortier v. Ameritech Mobile Comm., Inc.*, 161 F.3d 1106, 1113 (7th Cir. 1998) (positive evaluations before the adverse action are less relevant than performance evaluations from the time of the adverse action).

The parties have not specified when in 2008 Ruth Smith gave the training book to Fabiyi, or the date the company formally denied the training opportunity, or whether Fabiyi was supervised by managers from the Spring Road or Naper Boulevard restaurant at the time of the denial. The parties agree that the Crew trainer books were disseminated in 2008. (See R. 43, Def.'s Facts ¶ 15; R. 70, Pl.'s Facts ¶ 3.) Fabiyi transferred to the Naper Boulevard restaurant in September 2008. (R. 43, Def.'s Facts, Ex. B ¶ 3.) The company suggests that Fabiyi was denied training in 2009 but it did not submit any evidence to that effect. (See R. 42, Def.'s Mem. at 8.) Fabiyi claims that she was denied training in 2008. (R. 70, Pl.'s Resp. at 18.) Because the timing of the adverse action is in question, this court would have to weigh the evidence to determine whether Fabiyi's performance ratings qualified her for the training at the relevant time, which it may not do at summary judgment.

However, because Fabiyi concedes that she did not meet the availability prerequisite for the training opportunity, her denial of training claim cannot succeed despite this factual dispute about Fabiyi's performance during the relevant time period. As noted above, Fabiyi must show she was eligible for the training to

make out a prima facie case, and here there is no dispute that her lack of availability to work nights and weekends rendered her ineligible. *See Pafford*, 148 F.3d at 667. Fabiyi's claim fails on an additional ground: she has not met her burden of showing that similarly situated employees who were not members of her protected group were treated more favorably. *See id.* She does not suggest that other employees who were unavailable for weekend and evening work were given the opportunity to train for the Crew trainer position. Accordingly, she has not made out a prima facie case for discriminatory failure to train.

### 2.   Denials of Raises in January 2010 and April 2011

A denial of a raise is an adverse employment action. *Boumehdi v. Plastag Holdings, LLC,* 489 F.3d 781, 791 (7th Cir. 2007). To make a prima facie case of disparate treatment based on the company's withholding of salary increases in January 2010 and 2011, Fabiyi must establish the remaining two prongs of the *McDonnell Douglas* burden shifting analysis: that she met her employer's legitimate job expectations and that similarly situated employees outside of her protected class received more favorable treatment. *See Boumehdi*, 489 F.3d at 790. But, "[w]hen the employer asserts as the nondiscriminatory reason for [the adverse action] that the employee was not meeting legitimate job expectations, the credibility of the employer's assertion is at issue for both the second element of the plaintiff's prima facie case and the pretext analysis." *Everroad v. Scott Truck Sys., Inc.*, 604 F.3d 471, 477-78 (7th Cir. 2010). In such cases, the court may "skip the analysis of a

plaintiff's prima facie case and proceed directly to the evaluation of pretext."
*Adelman-Reyes v. Saint Xavier Univ.*, 500 F.3d 662, 665 (7th Cir. 2007).

Here, Fabiyi cannot establish that she was meeting the company's legitimate job expectations in January 2010 and April 2011. Fabiyi's final positive evaluation on record dates to March 2009. Later that year she was written up for an unexcused absence, a refusal to work the fry station, and a register shortage. Employee action forms from the following year document Fabiyi's additional register shortages, another unexcused absence, and episodes of insubordination for arguing in front of customers and refusing to clean the lot and lobby, a task that she admits was within her job description. Fabiyi does not show that she complied with the company's attendance policy, nor does she contest the bases for the other write-ups. She does not challenge the company's evidence showing that her formal evaluations from January 2010, July 2010, and April 2011 rated her job performance as "Needs Improvement."

Fabiyi tries to undercut those evaluations in two ways. First, she argues that the evaluations were the product of the company's discriminatory motive, but she provides no evidentiary support for this allegation. This unsupported supposition is inadequate to rebut the company's evidence. Second, Fabiyi asserts a "cat's paw" argument to suggest that the managers who authored her performance reviews were improperly influenced by Patricia Rivas, an employee who allegedly believed that black employees were less "valuable." The Seventh Circuit has "long recognized that a final decision-maker's reliance on an improperly motivated

recommendation from a subordinate may render the corporate employer liable." *Smith v. Bray*, 681 F.3d 888, 897 (7th Cir. 2012) (internal quotation omitted). This cat's paw theory requires a plaintiff to "show that an employee with discriminatory animus provided factual information or other input that may have affected the adverse employment action." *Id.* Here, Fabiyi's claim rests on an undated general hearsay statement that Rivas allegedly made about the relative "value" of non-black employees. Fabiyi provides no evidence of when or how Rivas may have influenced the managers who wrote Fabiyi's performance evaluations. Absent any evidence that the company's perception of Fabiyi's poor performance was predicated on Rivas's alleged input, Fabiyi's cat's paw argument must fail. *See Maarouf v. Walker Mfg. Co.,* 210 F.3d 750, 754 (7th Cir. 2000).

### 3. Reduction in Hours in January 2011 and May 2011

"[A] reduction in hours could be an adverse action giving rise to liability" under Title VII. *Hill v. Potter*, 625 F.3d 998, 1001 (7th Cir. 2010.) However, if an employee was not guaranteed a certain number of hours per week, than a reduction in hours is "not *per se* an adverse action." *Id.* Fabiyi has not alleged that the company guaranteed her a certain number of hours prior to the January 2011 and May 2011 reductions, so her claim here is not strong. However, because the company did not challenge Fabiyi's characterization of the reductions in hours as adverse actions, this court will proceed to the other elements of the prima facie case for disparate treatment. (See R. 42, Def.'s Mem. at 7.)

Like the company's decision to withhold wage increases, its non-discriminatory reason for its decision to reduce Fabiyi's scheduled hours was her poor performance. The company asserts that it reduced Fabiyi's hours in keeping with its policy of tying hours to performance ratings. Both of Fabiyi's hours reductions followed performance evaluations that rated Fabiyi as "Needs Improvement." Fabiyi tries to establish pretext by questioning the existence of the company's hours policy. The company claims that it shared the policy with employees by posting it in the Naper Boulevard restaurant's Crew room. (R. 43, Def.'s Facts ¶ 46.) Fabiyi admits to seeing the poster, but denies the company's characterization of the policy. She claims that the poster said only that hours would decrease if sales decreased. (R. 70, Pl.'s Fact Resp. ¶ 46.) At her deposition though, she acknowledged that Gass explained that her hours were reduced because her performance evaluation was poor. (R. 74, Fabiyi Dep. at 199-200.)

Fabiyi cannot rest on the absence of written documentation of the hours policy to establish pretext. *See Hill*, 625 F.3d at 1004 ("[S]imply the absence of written documentation of the Policy is not sufficient to meet [the plaintiff's] burden for demonstrating pretext."). Rather, to prove pretext, Fabiyi must present some evidence that raises the inference that the company's offered reason for reducing her hours may be a "phony excuse." *Id.* In other words, Fabiyi "must show that her employer did not honestly believe in the reasons it gave" for reducing her hours. *Everroad,* 604 F.3d at 478-79.

Here, though Fabiyi argues that her performance reviews were motivated by discrimination, she cites no evidence to back up her supposition. The company claims that Fabiyi's July 2010 "Needs Improvement" rating precipitated the January 2011 hours reduction. Fabiyi admits that her write-ups for a register shortage, a failure to call three hours in advance of a scheduled shift in April 2010, and for arguing in front of customers predate that rating. She provides no basis to cast doubt on the company's employee action forms that document these incidents. She also admits to two episodes in which she refused to clean the lot and lobby—a task that was within her role as a Crew member—prior to her April 2011 "Needs Improvement" rating, which the company claims precipitated the May 2011 hours reduction. Fabiyi does not offer any evidence to demonstrate that other employees who engaged in similar acts of insubordination were given higher ratings or assigned more hours. Nor does she know any employees with "Needs Improvement" ratings who were scheduled for more hours than her or did not experience a reduction in their scheduled hours. In other words, she has failed to show that the company failed to enforce its policies with similarly situated employees who were not members of her protected classes. Fabiyi has not come forward with any evidence to establish that the company's adherence to its policy was a "phony excuse." Thus, this court concludes that Fabiyi has not raised a triable issue of fact regarding whether the company's proffered reason for reducing her hours is pretextual.

### 4. One-Week Suspension in May 2010

In May 2010 Piasecki suspended Fabiyi for one week because she had accumulated three unexcused absences. A one-week suspension from work is an adverse action. *See Ellis v. CCA of Tennessee LLC*, 650 F.3d 640, 650 (7th Cir. 2011) ("There is no question that [a three-day] suspension could qualify as an adverse employment action."). To make a prima facie case of disparate treatment based on the May 2010 suspension, Fabiyi must establish the remaining two prongs of the *McDonnell Douglas* burden shifting analysis: that she met her employer's legitimate job expectations and that similarly situated employees outside of her protected class received more favorable treatment. *See Boumehdi,* 489 F.3d at 790.

The company's attendance policy requires employees to report to work or to call in sick at least three hours in advance of missing a scheduled shift. (See R. 43, Ex. B, Group Ex. F (informing employees that they "are requested in situations of sickness to contact the restaurant at least three hours before your shift begins, or if you're scheduled for the breakfast shift, you must contact the restaurant the night before").) The policy informs employees that violations may result in warnings, suspensions, and/or termination. (Id.) The company maintains that Fabiyi was suspended because she did not call or show up for her shift on October 26, 2009, April 19, 2010, and April 29, 2010, and it submitted employee action forms that document two of those violations of its attendance policy.[8] Fabiyi denies that she

---

[8] See footnote 5, *supra*, regarding Piasecki's allegation of an additional unexcused absence on April 19, 2010.

violated the attendance policy, stating that "I have always schedule [sic] off or if my kids were sick I would give a two hour notice to not coming in and this would be related to a manager on duty." (R. 70, Pl.'s Fact Resp. ¶ 30.) Viewing this admission in the light most favorable to Fabiyi, this court concludes that on the occasions that Fabiyi missed a scheduled shift, she contacted the restaurant two hours in advance of her shift. Fabiyi also asserts that Piasecki suspended her in retaliation for filing discrimination complaints. Fabiyi offers no proof of Piasecki's state of mind other than Fabiyi's own statements. Because Federal Rule of Civil Procedure 56(e) and Federal Rule of Evidence 602 disallow testimony that is not derived from personal knowledge, Fabiyi's speculations or hunches about Piasecki's state of mind are insufficient to thwart summary judgment. *See Visser v. Packer Eng'g Assoc., Inc.,* 924 F.3d 655, 659 (7th Cir. 1991) (en banc).

This court must examine Fabiyi's performance "through the eyes of her supervisors at the time of her suspension." *See Gates,* 513 F. 3d at 689. Based on the company's evidence of the unexcused absences, and Fabiyi's claim to have provided two hours of notice before missing work—which is one hour short of the three-hour notice required by the company's attendance policy—this court must conclude that Fabiyi has not shown that her performance met the company's attendance policy at the time of her suspension. Fabiyi has not suggested that any employees at the Naper Boulevard restaurant were granted leniency from the policy and she has not offered any evidence to show that similarly situated employees not

in her protected class were treated more favorably.  As such, Fabiyi's discrimination claim regarding the suspension cannot move forward.

### 5.     Removal from the Work Schedule

Fabiyi claims that the company discriminated against her in July 2011 when it removed her from the work schedule and placed her on unpaid medical leave. The company argues that the uncontroverted evidence shows that it removed Fabiyi from the work schedule for a nondiscriminatory reason: her doctor's medical restrictions prevented her from undertaking functions of the Crew member role that it believed to be essential.  To survive summary judgment on this aspect of her discrimination claim, Fabiyi must present sufficient evidence to cast doubt on the company's justification for the unpaid medical leave, such that a trier of fact could find that it was not the "real reason" for the adverse action.  *See McMillian v. Svetanoff,* 878 F.2d 186, 188-189 (7th Cir. 1989) ("[I]f a plaintiff in a discrimination case is unable to present any evidence to create a genuine issue as to whether the defendant's articulated reason for the [adverse action] is the real reason, then summary judgment will be appropriate.")

Fabiyi does not argue that the company disbelieved her doctors' claims regarding her limitations at the time that it placed her on medical leave.  Nor does she question the company's conclusion that bending and lifting were prerequisites to accomplishing essential functions of the Crew member role.  Rather, she suggests that HR Manager Dudan and supervisor Smith tried to deceive or hoodwink her into generating unnecessary documents from her doctor, or that the company

deceived or hoodwinked Dr. Osafo during his deposition to disclaim his medical basis for providing those documents. (See R. 70, Pl.'s Resp. at 26.) But neither of these suggested ruses rebut the company's explanation that Fabiyi's medical restrictions as she presented them at the time necessitated a medical leave. This court finds that Fabiyi has not identified "such weaknesses, implausibilities, inconsistencies, or contradictions in [the company's] proffered reasons that a reasonable person could find them unworthy of credence and hence infer that [the company] did not act for the asserted non-discriminatory reasons." *See Boumehdi*, 489 F.3d at 792. Accordingly, no reasonable jury could find in her favor on her unpaid medical leave claim.

## B. Retaliation Claim

Fabiyi claims that her supervisors retaliated against her for making complaints to the company's business integrity line and for filing claims with the IDHR. Title VII's anti-retaliation provision makes it unlawful for an employer to discriminate against an employee because the employee has "opposed any practice made an unlawful employment practice" under Title VII or who has "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under the statute. 42 U.S.C. § 2000e–3(a). Thus, under Title VII, unlawful retaliation occurs when an employer takes an adverse employment action against an employee for opposing discrimination. *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 980-981 (7th Cir. 2004) (internal quotation omitted).

"To survive summary judgment on her retaliation claim, [Fabiyi] must present sufficient direct or circumstantial evidence for the trier of fact to infer that there was a causal link between the protected activity and her [adverse action]." *Everroad*, 604 F.3d at 481. "In order to successfully establish retaliation under the direct method of proof, [the plaintiff] would have had to [1] offer evidence that [she] engaged in a statutorily protected activity, [2] that the defendants subjected [her] to an adverse employment action and [3] that a causal connection exists between the two events." *Gates*, 513 F.3d at 686 (internal quotation omitted). In the retaliation context, an adverse action is one that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

There is no controversy that Fabiyi's complaints to her employer and the IDHR constituted protected activity, but Fabiyi has presented no evidence that these activities caused any adverse actions. She uses the temporal proximity between her complaints of discrimination and the adverse actions to conjure a causal connection. For example, she suggests that her January 27, 2010 complaint to the business integrity line about wage discrimination led to her May 3, 2010 suspension for unexcused absences. Fabiyi also claims that her May 6, 2010 complaint to the IDHR and her May 26, 2010 complaint to the business integrity line caused the January 2011 reduction in her hours. Fabiyi relies also on the timing between her April 2011 hostile work environment complaint to the IDHR and the company's July 2011 decision to remove Fabiyi from the work schedule.

Fabiyi's efforts here are not enough to avoid summary judgment. The temporal relationships that she describes are too tenuous to suggest a causal link. *See Wyninger*, 361 F.3d at 981 ("[I]t is clear that mere temporal proximity is not enough to establish a genuine issue of material fact.") (internal quotation omitted); *see also Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 919 (7th Cir. 2000) ("Speculation based on suspicious timing alone, however, does not support a reasonable inference of retaliation; instead, plaintiffs must produce facts which somehow tie the adverse decision to the plaintiffs' protected actions."). Without any other evidence, the three- and six-month periods between allegations of discrimination and the adverse actions are not enough to establish the requisite causal connection. *See Naficy v. Illinois Dept. of Human Serv.*, 697 F.3d 504, 513 (7th Cir. 2012) (noting that a nine-month gap between a complaint and adverse event does little to raise suspicion); *see also Jajeh v. Cnty. of Cook*, 678 F.3d 560, 570 (7th Cir. 2012) (five-month gap between protected activity and layoff was insufficient to establish a causal connection).

Even if the sequence of events and the temporal relationships raise a question, Fabiyi has not presented any evidence that her supervisors were even aware of her protected activity. Fabiyi admitted in her deposition that she did not know whether Gass was aware of her complaints to the business integrity line or the IDHR. Her speculations about her managers' states of mind would not be admissible to resist the grant of summary judgment. *See Visser*, 924 F.2d at 659.

Fabiyi's attempts to establish a prima facie case using the indirect method of proof are flawed as well. The indirect method utilizes the burden-shifting framework of *McDonnell Douglas. Keeton,* 667 F.3d at 884. Fabiyi must show that "she engaged in protected activity, performed her job to her employer's legitimate expectations, suffered an adverse employment action, and was treated less favorably than similarly situated employees who did not engage in that protected activity." *Id.* "Absent direct evidence of retaliation, failure to satisfy any element of the prima facie case proves fatal to the employee's retaliation claim." *Hilt-Dyson*, 282 F.3d at 465.

For the reasons explained in the previous section pertaining to Fabiyi's disparate treatment claims, she is unable to make a prima facie case for any of the adverse actions in question. There is no evidence to tie the denial of training, the denials of salary increases, the suspension, the reductions in hours, or her removal from the work schedule to any of her complaints of discrimination. The record demonstrates that each adverse action (other than the denial of training) followed an uncontroverted showing of unsatisfactory performance. This is also true of her many "Needs Improvement" ratings, which her supervisors issued following many write-ups for insubordination. There is no evidence that the "Needs Improvement" ratings and adverse actions that flowed from them would not have been issued but for her complaints. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar,* 570 U.S. __, 133 S. Ct. 2517, 2533 (2013) ("Title VII retaliation claims must be proved according to traditional principles of but-for causation."). Moreover, she has not named a single

similarly situated employee who did not register claims of discrimination and who enjoyed more favorable treatment. Even if Fabiyi were able to make out a prima facie case, the company has presented legitimate reasons for each of the adverse actions at issue.

## C.  Hostile Work Environment Claim

Fabiyi alleges that the company created a hostile work environment on the basis of her race and sex by subjecting her to the two unwanted touchings by Alvarez, in addition to Piasecki's yelling regarding Fabiyi's performance evaluation, and Garrison's and Gass's yelling about Fabiyi's refusal to clean the lot and lobby. A hostile work environment claim under Title VII requires a plaintiff to prove "(1) that the work environment was both subjectively and objectively offensive; (2) that the harassment was based on membership in a protected class; (3) that the conduct was severe or pervasive; and (4) that there is a basis for employer liability." *Mendenhall v. Mueller Streamline Co.,* 419 F.3d 686, 691 (7th Cir. 2005).

This court can quickly dispose of the hostile work environment claims arising from the yelling episodes. The company argues that there is no evidence that the yelling by Piasecki, Gass, or Garrison was because of her sex or race. Indeed, Fabiyi's own characterizations of the yelling episodes show that she believed them to be related to her job performance, not her race or sex. For example, in her complaints to the business integrity line, Fabiyi described Piasecki's yelling as criticism for what Piasecki believed was unprofessional behavior. (R. 70, Pl.'s Ex. N.) Similarly, Fabiyi testified that Gass's and Garrison's yelling was about her

refusal to clean the lot and lobby. (R. 75, Fabiyi Dep. at 215-16, 222-23.) But to "maintain an actionable claim under a [hostile work environment] theory, an employee must demonstrate that her co-worker or supervisor harassed her because of her [protected characteristic]," *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 462 (7th Cir. 2002), so Fabiyi's claims arising from the yelling cannot succeed.

The remainder of Fabiyi's hostile work environment claim turns on the two alleged touchings by Alvarez. Fabiyi reported to the company on May 26, 2010, that swing manager Alvarez walked up behind her and rubbed her behind. She also claims that Alvarez touched her behind with his groin area sometime before April 2011, but she did not report this second incident to the company. Fabiyi's testimony to these touchings is not controverted, though the company maintains that Kimberly Smith's investigations failed to corroborate Fabiyi's allegations. Because this court construes the facts in favor of Fabiyi, *see Keeton*, 667 F.3d at 884, it will assume for purposes of this motion that the touchings occurred.

Fabiyi bears the burden to show that "the harassment was both subjectively and objectively so severe or pervasive as to alter the conditions of employment and create an abusive working environment." *Wyninger*, 361 F.3d at 975 (internal quotation omitted). The "standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a general civility code. Properly applied, they will filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal

quotations and citations omitted). The circumstances that a court may consider in deciding whether the environment is hostile include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).

Fabiyi argues that Alvarez's two touchings created a hostile, intimidating and uncomfortable work environment. In reviewing Fabiyi's descriptions of the two touchings, this court notes that Fabiyi has not alleged that Alvarez made sexist or sexual comments during the two touchings, or threatened her, or engaged in any type of humiliating behavior other than the physical contact. These two isolated touchings, which may have occurred about a year apart, are insufficiently severe to be actionable. *See Adusumilli v. City of Chicago*, 164 F.3d 353, 362-63 (7th Cir. 1998) (noting that isolated unwanted touching of the buttocks and teasing falls within a "safe harbor for employers in cases in which the alleged harassing conduct is too tepid or intermittent or equivocal to make a reasonable person believe that she has been discriminated against on the basis of sex") (internal quotation omitted).

Fabiyi argues that she has provided evidence sufficient to support a finding of employer liability. "[A]n employer may be vicariously liable for an employee's unlawful harassment only when the employer has empowered that employee to take tangible employment actions against the victim, *i.e.,* to effect a significant change in

employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits. *Vance v. Ball State Univ.,* 570 U.S. __, 133 S.Ct. 2434, 2443 (2013) (internal quotation omitted). In this case, the general manager of the Naper Boulevard restaurant affirmed that Alvarez was not empowered to fire Fabiyi or otherwise change the terms or conditions of her employment. (R. 43, Def.'s Facts ¶ 36.) Fabiyi has not provided any basis for questioning the company's assertion. (R. 70, Pl.'s Fact Resp. ¶ 36.) Thus, because Alvarez was not Fabiyi's supervisor under *Vance*, Fabiyi's reliance on *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998) and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998)—both of which turned on the actions of supervisors—is misplaced.

Whether Fabiyi has presented competent evidence such that a reasonable jury could find that the company was negligent in discovering or remedying Alvarez's regrettable, though not actionable, touchings, is less clear. *See Wyninger*, 361 F.3d at 976 ("To hold [the company] liable for the acts of [the plaintiff's] coworkers, as opposed to the actions of supervisors . . . [the plaintiff] must also demonstrate that [the employer] was negligent.). The company shows its exercise of reasonable care by asserting that it disseminated its anti-harassment policy to its employees and posted it in the breakroom of the Naper Boulevard restaurant. Fabiyi does not contest these assertions, nor the company's assertion that Kimberly Smith investigated Fabiyi's complaint of the first touching on June 24, 2010.

Fabiyi's argument here seems to be that Smith waited too long to interview her about the first touching and failed to follow through on Fabiyi's request that Alvarez be fired. (See R. 70, Pl.'s S.J. Mem. at 29-30.) Assuming actionable harassment, an employer could be held liable "if it did not promptly and adequately respond to employee harassment." *May v. Chrysler Group, LLC,* 716 F.3d 963, 971 (7th Cir. 2013). In this case, Fabiyi did not report the second touching to the company. Regarding the first touching, she chose not to report it to her supervisors at the Naper Boulevard restaurant. Instead, she called the company's business integrity line to lodge a litany of complaints about general discrimination, harassment, Piasecki's decision to send her home for insubordination, as well as the touching. (R. 70, Pl.'s Facts, Ex. B.) She made this call on May 26, 2010, the same day that the first touching allegedly occurred. (Id.) During that call, she specified that she did not want anyone but Smith, the Director of Human Resources, to investigate the claim. Whether the company's nearly month-long delay in investigating the claim was "a reasonable response" in light of Fabiyi's demand that it be investigated only by the company's director of human resources is a question of fact that would be best reserved for the fact-finder. *See May*, 716 F.3d at 971 (noting that the "facts and circumstances" of the case, including the "gravity of the harassment alleged," are factors in considering whether the employer's response was adequate, meaning "reasonably likely to end the harassment"). However, because this court finds that the Alvarez touchings were not actionable, Fabiyi cannot survive summary judgment on this claim.

**D.      Failure to Accommodate**

Fabiyi claims that the company violated the ADA by refusing to reasonably accommodate her alleged limitations and by discriminating against her because of her alleged disability.    The ADA protects a "qualified individual" from discrimination on the basis of disability "in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."    42 U.S.C. § 12112(a).  To establish a violation of the ADA, an employee must show "1) that she is disabled; 2) that she is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and 3) that the employer took an adverse job action against her because of her disability or failed to make a reasonable accommodation."   *Winsley v. Cook Cnty.*, 563 F.3d 598, 603 (7th Cir. 2009).

The company contests Fabiyi's ability to establish that she was a "qualified individual" within the meaning of the statute.    The ADA defines a "qualified individual" as a person who, "with or without reasonable accommodation, can perform the essential functions of the employment position" at issue.    42 U.S.C. § 12111(8).   Fabiyi suggests that she met this definition because she would have been able to perform the Crew member job with a reasonable accommodation.   She does not define what that accommodation would have been, but at the time she sought an accommodation, she submitted a doctor's letter that restricted her from bending over a heavy mop or working the fry station for more than 30 minutes.

Later, after the company requested more specific weight restrictions and an expected duration of those restrictions, Fabiyi submitted additional letters that restricted her from "excessive bending or heavy lifting."[9]

The company counters that the bending and lifting proscribed by Fabiyi's doctors were necessary to movements to perform the essential functions of the Crew member position, such as working the fry station and cleaning the lot and lobby. The company demonstrates that these functions are "essential" to the Crew member role by relying on its job description which lists both functions as a Crew member's responsibility. Consideration of the job description is permissible under the ADA, which instructs the fact finder to take into account "the employer's judgment," as evidenced in part by the employer's written job description. 42 U.S.C. § 12111(8). Fabiyi concedes that the Crew member job description and her job training covered the functions of making fries and cleaning the lot and lobby, both of which require bending and lifting. Additionally, she concedes that Crew members regularly performed those job functions. Without any evidence to the contrary, this court concludes that the company required Crew members to rotate through the job functions that Fabiyi's restrictions prevented her from undertaking. Thus, this court must conclude that Fabiyi is unable to show that she was capable of performing the essential functions of the job.

---

[9] She now claims that she told her supervisors that "no medical condition prevented her from cleaning the lot and lobby." (R. 70, Pl.'s Fact Resp. ¶ 64.)

Fabiyi's failure to accommodate claim also fails on another ground: Fabiyi is unable to show that the company is at fault for not making a reasonable accommodation. The uncontroverted evidence shows that the company, through its HR department, tried to elicit information about Fabiyi's condition and the expected duration of that condition, but Fabiyi was not entirely responsive. Fabiyi does not deny that she allowed months to pass without providing updated restrictions from her doctor. Nor does she deny that her doctors never informed the company of the expected duration of her alleged limitations. Fabiyi is unable to show that the breakdown in communications was the company's fault. "Liability for failure to provide reasonable accommodations ensues only where the employer bears responsibility for the breakdown." *Beck v. Univ. of Wisconsin Bd. of Regents,* 75 F.3d 1130, 1137 (7th Cir. 1996). For this reason as well, no reasonable jury could find in Fabiyi's favor on her failure to accommodate claim.

## Conclusion

For the foregoing reasons, the motion for summary judgment is granted.

**ENTER:**


_____
**Young B. Kim**
**United States Magistrate Judge**